OPINION
Plaintiff-appellant Donna Bradford appeals the decision of the Belmont County Common Pleas Court which granted summary judgment to her mother, defendant-appellee Nancy Freeman. For the following reasons, the judgment of the trial court is affirmed in part, reversed in part and this case is remanded.
 STATEMENT OF FACTS
In April 1994, John Freeman, whose only son was deceased, gave $90,136.94 to his daughter-in-law, Nancy Freeman (appellee). The transaction took place in two steps. On April 22, 1994, appellee met John at the bank and John transferred more than $43,000 from his savings account to that of appellee. John informed bank employees that he was worried about the security of his funds since his wife would soon be placed in a nursing home. On April 27, John cashed in two certificates of deposit worth more than $46,000 and transferred the funds to appellee's account. Also, in September 1994, John and his wife deeded their house over to appellee, leaving a life estate for John. John's wife died mid-1995.
In December 1996, John's attorney sent appellee a letter requesting that she return the money and reconvey the deed to the house. When appellee did not respond as requested, John obtained a new attorney who filed a complaint against appellee seeking $90,136.94 and the house. The complaint alleged that John transferred the money to appellee with the understanding that she could keep any interest the money generated but that John would be entitled to the principal upon demand. The complaint also alleged that appellee fraudulently induced John to transfer his house by making representations about Medicaid in relation to John's wife and her nursing home care. Appellee filed an answer which provided in part that the transfers were gifts. Later, appellee filed a jury demand. However, this demand was struck as it was filed untimely.
In January 1998, Donna Bradford (appellant) filed an amended complaint as the executrix of John's estate; he had since passed away. The complaint basically just substituted her name as the plaintiff. Appellant is appellee's daughter, John's granddaughter. The depositions of appellant, appellee, John, appellee's accountant and two bank employees were filed with the court. In July 1998, appellee filed a motion for summary judgment claiming that there were no genuine issues of material fact. The motion contended that there was no evidence of coercion with regards to the house and no evidence that John voiced his intent to appellee, prior to giving her the money, that he was only allowing her to keep the interest and that the principal had to be returned on demand.
On October 2, 1998, the court filed an opinion which granted summary judgment in favor of appellee. The last sentence of this opinion ordered appellee's counsel to submit a judgment entry for the court's signature. This judgment entry was submitted and time-stamped on October 14. Then, on October 20, appellant's attorney submitted a more detailed judgment entry which the court signed and time-stamped. Notice of appeal was filed on November 19.
On first glance, the appeal appears to be untimely filed. There is nothing on the record as to why appellant submitted a judgment entry or why the court signed it. The court cannot keep signing orders that grant summary judgment in the same case. However, the court failed to stamp either judgment entry with an instruction to the clerk's office to serve the parties. Furthermore, the clerk's docket does not demonstrate service of the judgments. Thus, we shall construe this appeal as being timely filed.
 ASSIGNMENT OF ERROR
Appellant's sole assignment of error provides:
 "The trial court erred in granting Defendant's Motion For Summary Judgment pursuant to Ohio Civil Rule 56."
We review the trial court's grant of summary judgment de novo. Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108. Pursuant to Civ.R. 56 (C), summary judgment is proper if: (1) no genuine issue of material fact remains to be litigated; (2) the movant is entitled to judgment as a matter of law; and (3) it appears that reasonable minds can only come to a conclusion that is adverse to the nonmovant. WelcoIndus., Inc. v. Allied Cos. (1993), 67 Ohio St.3d 344, 346. A trial court should exercise caution in awarding summary judgment, being careful to resolve doubts and construe evidence in favor of the nonmoving party. Id.
The movant has the initial burden to inform the trial court of the basis for its summary judgment motion by identifying the portions of the record that demonstrate the absence of a genuine issue for trial. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The burden then shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial in that reasonable minds could reach different conclusions. Id. To meet these burdens, the parties must point to proper supporting evidence. This evidence may consist of pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact. Civ.R. 56 (C).
In addressing whether the parties met their respective burdens, we shall engage in separate analyses for the transfer of money and the transfer of the land and house. We shall first address whether summary judgment was properly entered against appellant on the claim that appellee wrongfully retained the $90,136.94.
 ANALYSIS REGARDING FUND TRANSFER
In presenting evidence to support her initial burden, appellee, as the movant, points to the testimony of two bank employees. John talked to them about his wife entering a nursing home and his concerns about Medicaid. Tammy Bostic testified that John asked her what she thought about his transferring the money to appellee. When she replied that she could not advise him on that, John thought about it and then said, "I'm going to go ahead. She's going to get it in the end anyway." (Depo. 23). Carol Hoffman testified that John stated, "I'm going to give it to her, and she can do what she wants. It's all going to go to her anyway." (Depo. 18).
Appellee then points to the deposition testimony of her accountant Terrence Lee. He stated that appellee told him that she had been gifted money by her father-in-law and inquired about tax consequences. (Depo. 8). Appellee also relies on the deposition of John Freeman. She construes his testimony as an admission that he does not remember whether he conveyed to appellee his intent regarding the money prior to the transfer. She argues that it is apparent from his testimony that no discussion was had with appellee about the nature of the transaction.
In rebuttal and in establishing her reciprocal burden, appellant asks that John Freeman's testimony be read thoroughly and construed differently. Specifically, John Freeman testified to the following with regards to the monetary transaction:
 "A. Well, I had that money down there and talked to her and she, I guess I told her I would turn that over to her if she would invest it and I would give her the interest off of it. It was my money.
 Q. Okay. You said her. Who are you referring to?
A. Nancy.
 Q. Okay. When you called Nancy did you talk to her about this over the phone?
A. Well, I don't know whether we did or not.
 Q. Did you talk to her, Nancy, in person about this arrangement?
 A. Well, I think possibly like she said I possibly called her and she came to the bank because I was down at [the] bank. Like she said it was the Buckeye then. * * *
 Q. Before you went to the bank and this transfer took place did you have discussions with Nancy at any time before that about what your intentions were?
 A. Well, of course, the idea was that she was to pay me back the money, it wasn't hers, I didn't give it to her.
 Q. Did you ever talk with Nancy about that relationship before you went to the bank?
A. I don't remember.
 Q. So the discussions about this transaction all took place right at the bank?
A. Yes." (Depo. 16-17).
"* * *
 Q. Did you ever say anything to Nancy about this transaction other than what took place at the bank in April of 1994?
 A. Well, she knew I wasn't giving her this money. * * * Because I told her to invest it and I would give her the interest off of it.
 Q. Did you ever discuss that with Nancy on any other times other than at the bank?
A. No. I don't remember." (Depo. 18).
"* * *
 A. As far as I know, Nancy, she tells me now I was giving her this money but then she knew at the time I wasn't.
 Q. And you expressed to Nancy your thoughts about giving her the money or loaning her the money or allowing her to invest the money apparently on one occasion at the bank?
 A. I suggested to her that she invest in CD's or insurance company. That was all." (Depo. 19).
"* * *
 A. I told her she could have the interest off of it. * * * She knew that. She might have forgot it but she knew it." (Depo 29).
In reading eighty-eight year old John Freeman's testimony in its entirety, one gets the impression that he was confused at times. Appellant argues that this testimony establishes that John told appellee that he was not giving her the principal but only the interest. In support of this proposition, a reading of appellee's deposition testimony reveals the following:
 "I don't know that I said much of anything. He just called me, I went in, he was transferring this money to me. * * * I thought he wanted me to have it. His son, it was his only child and I'm the only one. * * * He just told me — and I asked. Well, that he was signing this over to me and I said do you want the interest? He said no. And he said do whatever you want, put it in CD's or whatever you want." (Depo. 24-25).
Appellee's admission that she asked if John wanted the interest, raises some questions as to her knowledge of his intent to ask for the principal back someday.
Most importantly, appellant testified as follows:
 "The end of April of `94 she [appellee] called me and she said that three days before that grandpa had called her at home and told her to meet him at the Buckeye and so she went over, that he wanted to transfer some money to her, so she went over there and the money was transferred to her.
 Now, what she told me then was that he transferred this money to her but she could keep the interest, not the principal." (Depo. 9).
If this conversation actually occurred as alleged by appellant, then appellee's contention that she thought the money was a gift is untrue. This establishes the genuine issue of material fact. Credibility of the witnesses is not to be assessed in a summary judgment proceeding from the mere reading of depositions. Turner v. Turner (1993), 67 Ohio St.3d 337, 341
(holding that summary judgment is inappropriate where one party's statement conflicts with the other party's on a fact material to the controversy). This issue should have gone to trial, albeit a bench trial, where the court could listen to appellant and appellee testify live. Perez v. Scripps-Howard Broadcasting Co.
(1988), 35 Ohio St.3d 215, 218 (explaining that the court cannot choose among reasonable inferences or weigh proof and credibility in deciding whether summary judgment should be granted).
The concept that credibility is a question for the trier of fact revolves around the premise the trier of fact occupies the best position from which to view the witnesses' demeanor, gestures and voice inflections. See Myers v. Carson (1993), 66 Ohio St.3d 610,615; Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80; State v. DeHass (1967), 10 Ohio St.2d 230, 231. This premise was not properly utilized in the case at bar.
Construing the evidence in a light most favorable to the nonmovant, reasonable minds could find that appellee was aware of the plan that she could invest appellant's money but could not keep more than the interest it generated. As such, the portion of the summary judgment which was entered regarding the $90,136.94 is reversed, and the issue is remanded for trial.
 ANALYSIS REGARDING DEED TRANSFER
Next, we shall discuss the claim that appellant fraudulently induced John Freeman to transfer his house to her. In establishing her initial burden, appellee claims that she was unaware that John Freeman signed the deed to his house over to her until more than a year after the September 1994 transfer. (Depo. 45, 50). Appellee filed the affidavit of John's original attorney who prepared the deed for John. This affidavit states that John requested that a deed be prepared from him and his wife to appellee. The affidavit also stated appellee was not present when the attorney was consulted or when the deed was signed by John and his wife. The attorney stated that he was unaware of any fraudulent inducement and opined that John's wife understood what she was signing.
In attempting to meet her burden, appellant refers to the following story contained in her deposition testimony:
 "So then during that summer of `94 there was three different times she [appellee] called me and told me about the house and that she had talked to grandpa about transferring the house to her and that he said he would do it but, and her exact words were, he said he would do it but he hasn't done it yet and I'm going to have to get on him about it. Finally the call came that he had transferred the house to her." (Depo. 9)
Firstly, there is nothing in this testimony that demonstrates fraudulent inducement. Appellant herself stated John's attorney advised him that he could avoid probate by transferring his house prior to death. (Depo. 12). A potential heir[1] is not prohibited from asking a potential testator to sign property over prior to death to avoid probate and possibly estate taxes. Appellee admitted that she mentioned to John that he should consider transferring his house to someone because if he ever went into a nursing home, then after his funds were expended on the care of himself and his wife, it is possible that Medicaid could take his house. (Depo. 46). Appellant presented no evidence suggesting that this is not the way Medicaid works and thus no evidence establishing fraudulent inducement. It is not fraudulent to tell your father-in-law about a possible Medicaid scenario. Furthermore, John testified that he did not make the transfers to shelter money from Medicaid. (Depo. 20-22).
Even more significantly, John Freeman's testimony makes it apparent that his request for the house back was an attempt to revoke a prior gift due to what he perceives as changed circumstances. For instance, John expressly stated:
 "Well, now, it had been discussed I think some time before that. I think at that time maybe she had asked me about it different times. * * * I had plans, if I did, the grandchildren would get it from her. Now I find out they're not going to. * * * I thought she got along with the grandchildren all right, she does part of them; now I find out she don't with all of them. Well, I talked to her and she says you're just going to, you're just fixing for the grandchildren to get that property and they're not going to get it. * * * That's when I asked her for it back." (Tr. 35-36).
Furthermore, the main reason that summary judgment is appropriate is contained in the following excerpt:
 "Q. I guess what I mean was it your intention that when you transferred property and money to Nancy that eventually those assets would get to your grandchildren?
 A. Well, I hadn't thought much of anything about that at the time.
* * *
 Q. And apparently you didn't direct or have any conversation or direct Nancy in any specific way with respect to the property and then it passing down to the grandchildren?
A. No." (Depo. 37-38).
John Freeman essentially states that he only wanted the deed back because he found out appellee was not getting along with all of her children. He admits that he did not transfer the deed to appellee based upon an agreement that it would be transferred to the grandchildren one day. He did not testify to fraudulent inducement on the part of appellee. A reasonable mind would only conclude that there was no evidence of fraudulent inducement. Thus, appellant tailed to meet her reciprocal burden under Dresher
of producing a genuine issue of material fact regarding the transfer of the house. Hence, the grant of summary judgment for appellee on appellant's claim that John Freeman was fraudulently induced to transfer his house is affirmed.
For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part and this cause is remanded to the trial court for further proceedings consistent with this court's opinion and according to law.
Donofrio, J., concurs, Waite, J., concurs.
_________________________ JOSEPH J. VUKOVICH, JUDGE
[1] Appellee says that she believed that she was the primary beneficiary of John Freeman's will, and both bank employees testified that John said that appellee would get everything anyway.